UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
NORRIS E. FRANCIS, JR.,

                     Plaintiff,                  **MEMORANDUM AND ORDER**
                                                       CV 04-0417 (WDW)

        -against-

PACTIV CORPORATION, RICHARD WAMBOLD
in his individual and official capacity, JIM MORRIS
in his individual and official capacity, SEAN
CONDON in his individual and official capacity,
and CHARLES VINOPAL in his individual and
official capacity,

                     Defendants.
-------------------------------------------------------------------X

**APPEARANCES:**

**LAW OFFICES OF FREDERICK K. BREWINGTON**
Attorneys for Plaintiff
50 Clinton Street
Hempstead, New York 11550

**SEYFARTH SHAW LLP**
Attorneys for Defendants
1270 Avenue of the Americas
New York, New York, 10020-1801

**WALL, Magistrate Judge:**

       Before the court is the motion for summary judgment by the defendants, Pactiv

Corporation ("Pactiv"), Jim Morris, Sean Condon, and Charles Vinopal.[1]  Plaintiff has opposed

the motion, and a hearing was held before the undersigned on November 3, 2006.  For the

reasons set forth herein, the motion for summary judgment is granted.

---

[1]The remaining defendant, Richard Wambold, was dismissed from the case by Stipulation
and Order entered by Judge Wexler on March 16, 2005.  See Docket Entry [19].

**BACKGROUND**

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are undisputed unless otherwise noted.

In February 2004, the plaintiff, Norris Francis, Jr. ("Francis"), commenced this action claiming that defendants discriminated against him because of his race and because of his age in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §2000e et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 et seq.; 42 U.S.C. §1981; and New York State Human Rights Law, New York Executive Law, article 15 §296. Plaintiff further claims that his discharge constituted a breach of an implied contract.

Over the course of about nineteen years, Francis worked for a series of companies that, through various takeovers and mergers, became Pactiv Corporation in 1999. An organization chart provided by defendants is reproduced below:



Morris Aff., Ex. A, Docket Entry ("DE") [31]. Pactiv has three business groups, Consumer Products, Protective and Flexible Packaging, and Foodservice/Food Packaging. Defendants' Rule 56.1 Statement ("Defs' Stmt") ¶1. The Protective and Flexible Packaging group is further broken down into five business units, Protective Packaging North America ("PPNA"), Molded

Fiber, Building Products, Slide-Rite, and Hexacomb. *Id.* ¶ 2. Defendants claim that each of these five business units "operates as a wholly independent business, separate and apart from every other unit." *Id.* ¶8. Each business unit is run by a General Manager or Business Manager who reports to the Senior Vice President and General Manager of the Protective and Flexible Packaging group. *Id.* ¶ 9. While plaintiff agrees that each unit "is responsible for its own management team, sales force, manufacturing and support staff, he "denies the allegation that these units operate as 'wholly independent business,' or are completely separate and apart from every other unit." Plaintiff's Rule 56.1 Counterstatement ("Pl.'s Stmt") ¶ 8.

The PPNA unit of the Protective and Flexible Packaging group manufactures and sells packaging products used primarily to protect goods shipped in commerce. In 2001, all PPNA Regional Sales Managers reported to one of three Directors of Sales, who in turn reported to defendant Sean Condon, PPNA Vice President of Sales. Plaintiff was employed as National Account Manager at PPNA and, beginning in 2001, also reported directly to Condon. Condon reported to the most senior official in the PPNA business unit, Andy Brewer, the Vice President and General Manager of PPNA. Brewer in turn reported to defendant Jim Morris, Senior Vice President and General Manager of the Protective and Flexible business group.

In December 2001, Pactiv, by written communication, announced a firm-wide reduction in force ("RIF") scheduled to take place effective January 15, 2002. Defts' Stmt ¶29. Pactiv advised that those employees affected by the RIF would only be permitted to transfer into open positions, and were eligible for severance pay of two weeks pay for each year of service to the company up to a maximum 26 weeks. *Id.* ¶¶30-31. Approximately seventy-seven employees firm-wide were let go in connection with this RIF. Vinopal Aff. ¶9.

Brewer, who joined Pactiv in September 2001, determined that there were too many layers of management between PPNA's senior staff and its customers and decided to restructure PPNA's workforce. Defs' Stmt ¶22. Specific to plaintiff's case, Brewer believed that the fact that others in the industry used the Vice President of Sales position to service national accounts provided those companies with a competitive advantage over PPNA, and that PPNA should revise its structure accordingly. Brewer Aff. ¶5. Having the Vice President of Sales service national accounts would render the National Account Manager position "inefficient and unnecessary." *Id.* Morris, as Senior Vice President and General Manager of the Protective and Flexible business group, approved Brewer's strategy in general and determined that the proposed restructuring was consistent with Brewer's stated business strategy, but he did not determine the appropriateness of the individual positions to be eliminated. Defs' Stmt ¶¶23-24, 33. In addition to the National Account Manager position held by Francis, Brewer and Condon decided to eliminate the three Director of Sales positions, all of which were held by Caucasian men. *Id.* ¶¶25-28.

Brewer claims that at the time he decided to eliminate the National Account Manager position and move that position's responsibilities for servicing national accounts to the Vice President of Sales, he was unaware of either the age or race of plaintiff. Brewer Aff. ¶5. Defendant Charles Vinopal, the Director of Human Resources for the Protective and Flexible business group assigned to service PPNA as well as the other business units within that group, testified that since plaintiff is over age 40 and a member of a minority group, his inclusion in the RIF raised a "red flag." Vinopal Dep. 108:13-21. He further testified he had the same reaction regarding any minority group member, woman, or employee older than 40 selected to participate

in the RIF, *id.* 187:23-188:13, and that he did not see evidence of any discrimination in the determination to eliminate plaintiff's position. *Id.* 112:6-23.

On or about January 10, 2002, a meeting took place with Francis, Condon, and Vinopal. Francis was informed that the company was eliminating his position as part of the RIF and reassigning his duties. Defs' Stmt ¶¶36-37. He was offered a position as a sales representative in Dallas, Texas, at a significantly reduced rate of pay, which he refused. *Id.* Given Francis's years of service with Pactiv and its corporate predecessors, he was offered the maximum severance pay of twenty-six weeks pay. *Id.* It is unclear whether plaintiff ever accepted severance pay from Pactiv. Defendants claim that "[n]o one who participated in the RIF received severance pay in excess of twenty-six weeks." *Id.* ¶44. Plaintiff does not dispute this, but rather points to specific Caucasian employees who left prior to the RIF that were granted higher and more generous severance packages than plaintiff. Pl.'s Stmt ¶¶46-48.

Francis left his employment with Pactiv on or about January 31, 2002. In a letter dated February 5, 2002, plaintiff's attorney Frederick Brewington wrote to Vinopal regarding plaintiff's termination, stated that it was discriminatory, and offered to negotiate a severance package that would include five years salary, including health benefits and 401(k) contributions, and transfer of ownership of the company car to Francis. Brewington Decl., Ex. N. On April 2, 2002, plaintiff filed a complaint alleging age-based and race-based discrimination with the New York State Division of Human Rights. *Id.,* Ex. L.

In August 2002, Francis received a bonus of $12,000 for calendar year 2001. The circumstances surrounding payment of this bonus are disputed. Defendants acknowledge that other bonuses were paid out in March 2002, Defs' Stmt ¶¶57-58, but claim that the delay in the

calculation and payment of plaintiff's bonus was an "administrative oversight caused by the fact that Francis' position had been eliminated." *Id.* ¶59.  Plaintiff, however, claims that his payment was withheld after he made formal complaints of discrimination.  Francis Aff. ¶40.

Plaintiff claims he was treated differently than younger, Caucasian employees in regard to severance pay, and the offer of comparable jobs within the company, and that he was denied the opportunity to negotiate his departure.  Francis further claims that his National Account Manager position was the only one of seven such positions eliminated, and that all the other National Account Managers at PPNA were white, younger, and less qualified than Francis.  Pl.'s Stmt ¶105.  Defendants claim that Francis was the only National Account Manager in the PPNA business unit and that it is not appropriate to compare Francis's position with any National Account Manager position in the other business units.  Finally, plaintiff notes that he was the only African-American National Account Manager and that throughout his years with the company, Pactiv employed few African-Americans in upper level positions.

## DISCUSSION

### A.  Summary Judgment Standards

**-Federal Rule of Civil Procedure 56**-

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.P.* 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most

favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 128 (2d Cir. 1996). The applicable substantive law determines which facts are critical and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir. 1996) (quoting *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994)).

Moreover, in discrimination cases, "[a] trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." *Scelza v. North Fork Bank,* 33 F. Supp. 2d 193, 197 (E.D.N.Y. 1999)(citations omitted). Since direct evidence of intentional discrimination is rarely found, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.*

When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish,* 85 F. Supp. 2d at 180 (quoting *Celotex,* 477 U.S. at 322). A plaintiff alleging discrimination must also establish "concrete particulars to substantiate the claim." *Hunt v. Tektronix, Inc.,* 952 F. Supp. 998, 1002 (W.D.N.Y. 1997) (citing *Meiri v. Dacon,* 759 F.2d 989

(2d Cir. 1985)).  Even where the employer's intent is at issue, "a plaintiff must provide more than

conclusory allegations of discrimination to defeat a motion for summary judgment."  *Schwapp v.*

*Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997).

A moving party may obtain summary judgment by demonstrating that little or no

evidence may be found in support of the non-moving party's case.  "When no rational jury could

find in favor of the nonmoving party because the evidence to support its case is so slight, there is

no genuine issue of material fact and a grant of summary judgment is proper."  *Marks v. New*

*York Univ.,* 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).  Where, however, evaluation of the non-

movant's proof rests on the credibility of the non-movant versus the movant, a genuine issue

exists and summary judgment cannot be granted.  "Where an issue as to a material fact cannot be

resolved without observation of the demeanor of witnesses in order to evaluate their credibility,

summary judgment is not appropriate."  *See* Wright, Miller & Kane*, Federal Practice and*

*Procedure,* Vol. 10A, §2726 (quoting Advisory Committee Notes to1963 amendment of Rule

56(e)).  With these standards in mind, the court now turns to defendants' motion.

**B.**     **Title VII, ADEA, and New York State Human Rights Law Claims**

Francis claims that the termination of his employment was made on the basis of race in

violation of Title VII of the Federal Civil Rights Act of 1964, as amended by the Civil Rights Act

of 1991, commonly referred to as Title VII,[2] and/or on the basis of his age in violation of the Age

---

[2]Title VII prohibits an employer from engaging in the following practices with regard to a
person's race:  "To . . . discharge any individual, or otherwise to discriminate against any
individual with respect to his compensation, terms, conditions, or privileges of employment,
because of such individual's race. . ."  42 U.S.C. §2000e-2(a).

Discrimination in Employment Act, 29 U.S.C. §623 et seq. ("ADEA"),[3] and/or on the basis of his race and/or age in violation of New York Civil Rights Law §296.[4]

"The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met [his] burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason." *Stratton v. Dep't for the Aging for the City of New York,* 132 F.3d 869, 878 (2d Cir. 1997)(citations omitted). The three-part burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), is used to analyze claims of discrimination under Title VII and ADEA. *See Montana v. First Federal Svgs & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir. 1989)(citations omitted). Claims under the Human Rights Law are "analytically identical to claims brought under Title VII" and ADEA and are thus subject to the same burden shifting analysis. *Torres v. Pisano,* 116 F.3d 625, 659 n.1 (2d Cir. 1997); *see also Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir. 1993). First, plaintiff must establish a *prima facie* case of discrimination based on race and/or age; if he does so, the employer bears the burden of articulating a legitimate, nondiscriminatory reason for plaintiff's dismissal; if the employer comes forward with such a reason, plaintiff must prove that the reason is a pretext and that discrimination was the actual reason for the dismissal. *See, e.g., Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir. 2000).

---

[3]ADEA prohibits an employer from engaging in the following practices with regard to a person over 40 years of age: "to . . . . discharge an individual or otherwise discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623 (a)(1).

[4]New York's Human Rights Law states that it shall be an unlawful discriminatory practice for an employer "because of the age, race. . .of an individual. . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." Executive Law §296 (a).

### 1. Plaintiff's Prima Facie Case

To establish a *prima facie* case of discrimination, Francis must establish four elements: 1) that he is a member of a protected class; 2) that he is qualified for the job; 3) that he was subject to an adverse job action, in this case dismissal; and 4) that the dismissal took place under circumstances giving rise to an inference of discrimination based on his membership in a protected class. *Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir. 1991). The burden of establishing a *prima facie* case has been characterized as "minimal." *See Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir. 2000). In this case, defendants apparently do not dispute that plaintiff can establish the first three elements, but argue that he is unable to establish the fourth element.

A plaintiff can raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham*, 230 F.3d at 39. Francis raises several arguments that he claims support an inference of discrimination in this case.

### a. Treatment of other National Account Managers

Several of the arguments raised by plaintiff rely on comparisons between the treatment afforded to Francis as compared to that given other persons with the job title of "National Accounts Manager." Plaintiff contends that he was the only African-American National Account Manager within the PPNA division, that his was the only National Account Manager position eliminated during the company-wide restructuring, and that there were other younger, Caucasian National Account Managers in the PPNA division who were not discharged as part of the RIF. Pl. Memo in Opp., 6. While defendants do not dispute that Francis was the only African-

American National Account Manager or that his position was the only one with that title that was eliminated, they claim that there was only one National Account Manager position in the PPNA business unit. Plaintiff's evidence for his assertion that there are at least seven National Account Managers is a single piece of documentary evidence–a list entitled PPNA SALES FUNCTION. Brewington Decl., Ex. I. This list appears on its face to be a list of PPNA employees, by job title. The data is arranged in columns including "Job Title," "Business Unit" and "Age." This document, which indicates in the column "Business Unit" that all seven National Account Managers were in "PPNA Sales" or "PPNA," is cited by plaintiff as proof that seven National Account Manager positions, including his own, existed in the PPNA business unit. *See* Brewington Decl., Ex. I at pp. 2, 5, 15. Beyond this document, plaintiff has presented no other evidence that additional National Account Manager positions existed within the PPNA business unit.

Since many of plaintiff's arguments rest upon the comparison between the treatment of him as compared with the other six alleged National Account Managers, the court conducted a hearing on the limited issue of "the number of National Account Managers employed by the PPNA unit of defendant Pactiv at the time of plaintiff's discharge." Order, DE [43]. Responding to the court's invitation to provide additional evidence at that hearing, defendants Vinopal and Brewer provided testimony and were subject to cross-examination. Vinopal, the Human Resources Director for the Protective and Flexible Packaging group, testified that prior to the year 2000, the Protective and Flexible Packaging group was known as "Protective Packaging North America" or "PPNA," and that there was an independent business unit within that group also known as PPNA. Hrg. 11/3/06, Tr. 17:1-18:1. He further testified that the PPNA SALES

11

FUNCTION document was electronically generated from the human resource information system and that the system designated all of the positions within the Protective and Flexible Packaging group as part of PPNA, the former name of that group. *Id.* 23:19-25 (emphasis added). The entries "PPNA Sales" and "PPNA" in the "Business Unit" columns did not refer to solely the PPNA unit in which plaintiff worked, but included anything within the Protective and Flexible Packaging group. *Id.* 22:17-23:2. Plaintiff Francis, they testified, was the only National Account Manager in the PPNA business unit. *Id.* 18:18-20.

Plaintiff did not provide any evidence at the hearing. At the conclusion of this hearing, the following exchange took place between the court and plaintiff's counsel:

> COURT: Mr. Fogelgaren, you want to be heard further?
>
> MR. FOGELGAREN: Just on the point that there were other national account managers?...There were other national account managers.
>
> COURT: In other divisions.
>
> MR. FOGELGAREN: Not in the particular division but there were other national account managers performing a similar function to Mr. Francis.
>
> COURT: Right, in other independent business units.
>
> MR. FOGELGAREN: Of the same corporation.
>
> COURT: Yes. I understand.
>
> MR. FOGELGAREN: With the same human resource in place for them who were under the same review of this reduction in force.

Hrg. 11/3/06, Tr. 48:19-49:11. The court is satisfied that there is no evidence to support a finding that more than one National Account Manager position existed within the PPNA business unit and finds that no rational jury could determine otherwise.

Despite having found that plaintiff was the only National Account Manager in the PPNA business unit, plaintiff's contention that his was the only National Account Manager position eliminated in the RIF is sound. Accordingly, the court must still address the issue of whether it is appropriate to compare his treatment with that afforded to National Account Managers in the other four divisions. In other words, were the six other National Account Managers excluded from the RIF similarly situated to plaintiff?

To be similarly situated, the individuals to whom plaintiff seeks to compare himself "must be similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir. 1997). "When plaintiffs seek to draw inferences of discrimination by showing that they were 'similarly situated in all material respects' to the individuals to whom they compare themselves. . . their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 101 (2d Cir. 2001)(citations omitted). In addition, to establish that persons are similarly situated in all material respects, "a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards." *Graham,* 230 F.3d at 40. Whether two people are similarly situated is a question of fact, but plaintiff must, on summary judgment, provide sufficient evidence from which a jury could reach that conclusion. *See Lizardo,* 270 F.3d at 101.

Ordinarily, individuals employed in different units under a single employer are not similarly situated to one another. *See Manessis v. New York City Dep't of Transp.,* 2003 WL 289969, t *10 (S.D.N.Y. Feb. 10, 2003) (employees automatically eliminated from analysis where those employees had different supervisors and performed different tasks from plaintiff).

Defendants' claim that the five divisions of the Protective and Flexible Packaging group operated as five independent and distinct business units and thus the National Account Managers employed in business units other than PPNA are not similarly situated to plaintiff. Plaintiff states that the claim of independence is "refuted by documentary and testimonial evidence, suggesting that the National Account Managers within Pactiv's PPNA division worked in a more intertwined, at times overlapping fashion." Pl.'s Mem. in Opp., 13. While plaintiff points out that all five business units "fell under the same umbrella of higher management," reported to the same Protective and Flexible Packaging business group, and were subject to the authority of Jim Morris, Francis Aff. ¶¶49-51, he also acknowledges that each of the five business units "concentrate[s] on specific types of protective packaging products" and had different client groups and different types of products. *Id.* ¶¶48-49. Therefore the court must determine whether a reasonable trier of fact could find that the National Account Managers are similarly situated to one another despite the fact that they work for different business units.

Plaintiff's evidence that the business units are not independent and distinct is that 1) all the units report to the same executive in the Protective and Flexible Packaging business group, Senior Vice President and General Manager Jim Morris, and 2) the National Account Managers had virtually the same job responsibilities, would sometimes share a common client, and would occasionally overlap on the same accounts. Francis Aff. ¶¶47-55. It is not disputed that Brewer, and indeed each of the other General Managers in the five business units, reported to Morris. Although Morris had responsibility for oversight of all five of the business units in the Protective and Flexible Packaging business group, there is no evidence that he had any involvement in supervising employees within those divisions. Indeed the evidence regarding the corporate

structure of Pactiv and Morris's testimony demonstrates the opposite: "Each of these units is managed by either a General Manager or a Business Manager, each of whom report to me. I am not responsible for the day to day affairs of these business units in my role as the Senior Vice President and General Manager of the Protective and Flexible Packaging business group." Morris Aff. ¶11. There is also no suggestion, let alone evidence, that Brewer interacted with his counterparts in any of the other four divisions, or that he consulted with them in any way regarding any issue, including personnel decisions. Plaintiff has provided no evidence to refute Brewer's statements that he is unaware of marketing strategies or business plans of the other business units, Brewer Aff. ¶6, or that he has no authority over employees in other business units and he does not consult with management from the other business units "with respect to business strategy, organization or any other business matters." *Id.* ¶8.

Other than the fact that Morris oversees all the business units, the only evidence cited by plaintiff is his own testimony regarding isolated incidents of overlapping work with other National Account Managers on shared accounts, and the argument that the positions had virtually the same job responsibilities. Plaintiff does not present any evidence, including any testimony from any of the other National Account Managers, regarding the "overlap" between the various business units. The simple fact that seven National Account Managers employed in different business units shared the same job title or even had similar responsibilities within their business units is insufficient to support a finding that those employees were similarly situated to plaintiff for purposes of establishing disparate treatment.

Plaintiff also refers to a Pactiv "Position Description," Brewington Decl., Ex. M, as evidence that "the retained National Accounts Managers were not as 'separate and independent'

as defendants ask this court to believe." Pl.'s Memo in Opp. 13. This document does not appear on its face to be a general job description, but rather one that is specific to employee Norris E. Francis. Even if every National Account Manager had similar job responsibilities within their own divisions, however, that fact alone would not make them similarly situated absent evidence that they were supervised by the same person, in this case Brewer. *See, e.g., Shumway,* 113 F.3d at 64 (plaintiff not similarly situated to employees who were not supervised by the same managers as plaintiff).

Additionally, there is no evidence to suggest that anyone outside of the PPNA business unit had any input in deciding what positions would be eliminated in the January 2002 RIF. Other than Morris, who was aware of and approved the plan put forth by Brewer, the record is devoid of any evidence that the five business units acted in concert or even consulted one another on any issue, including what positions to eliminate in the RIF. Thus the court finds that no reasonable trier of fact could find that Francis was similarly situated with the National Account Managers employed in business units other than PPNA.

### b. Disparate Treatment in Offering of Severance Packages

Plaintiff has not identified a single employee discharged as part of the RIF who received severance pay under a different formula than that applied to him, nor does he dispute defendants' claim that no employee who participated in the RIF received severance pay in excess of twenty-six weeks. He does, however, claim that he was given less severance than other younger, less experienced employees who left Pactiv prior to the RIF. In support of this argument, plaintiff discusses the severance packages received by three Caucasian employees, J. Matthew Davidson, William Renick, and Robert Biddle. Plaintiff claims that he and Davidson "occupied similar

16

levels of higher management," that Davidson was employed in the same business unit, and that

he left the company at age 44 with two years in severance pay. Francis Aff. ¶36. As to Renick,

plaintiff claims that they "occupied similar levels of higher management," that Renick was

employed in the same business unit, and that he left the company in 1999 at age 48 with one year

in severance pay. *Id*. ¶37. Finally, plaintiff points to the allegedly disparate treatment afforded

Biddle, who negotiated twenty-six weeks in severance pay despite only working for the company

for three years. *Id*. ¶ 38.

Defendants have provided further undisputed facts about the departures of these three

men: Davidson left in 1998, was a Vice President and General Manager, and agreed to be bound

by a two year non-compete covenant, Defs' Stmt ¶ 17; Renick left in 1999, held a Vice President

position, and agreed to be bound by a two year non-compete covenant, *id.* ¶ 18; and Biddle left in

May 2001 and held a Vice President position. *Id.* ¶ 20. Defendants also note that these three

employees held Vice President positions which were more senior than plaintiff's National

Account Manager position, a characterization that plaintiff disputes.

The treatment of these three employees, however, is not relevant to plaintiff's treatment

since they left prior to, and not as part of, the January 2002 RIF. "Thus, even assuming that

[plaintiff] received less favorable treatment than those employees, their severance awards could

not support an inference that the . . . RIF, pursuant to which [plaintiff] was terminated, was

implemented in a discriminatory manner." *Goenaga v. March of Dimes Birth Defects Found.,* 51

F.3d 14, 19 (2d Cir. 1995). Moreover, the departures of Davidson in 1998, and Renick in 1999,

are too temporally remote to be compared with defendants' treatment of plaintiff. Although

Biddle left in May 2001, only eight months prior to the January 2002 RIF, his departure was

negotiated before the arrival at PPNA of Brewer, and thus the circumstances regarding his departure cannot be used by plaintiff to support an inference of discrimination. *See generally Partridge v. HIP of Greater New York,* 2000 WL 827299, at *3 (S.D.N.Y. June 26, 2000) (officers who left under entirely distinct circumstances, each with individualized separation packages, are not good comparators to plaintiff affected by corporate restructuring). Since plaintiff has provided no evidence that any similarly situated employees were treated differently as to the amount of severance pay received, he has failed to establish a *prima facie* case of disparate treatment in this regard. *See Dew v. Health Ins. Plan of Greater New York,* 208 F.3d 202 (2d Cir. 2000).

Plaintiff's argument that he should have been given the opportunity to negotiate the terms of his departure is similarly unavailing absent evidence that other departing employees that were part of the January 2002 RIF were allowed to negotiate the terms of their departures. The only such evidence presented concerns the treatment afforded Dale Sprosty. Sprosty, a former Director of Sales at PPNA, is a white male, age approximately 49 at the time of the RIF. Defs' Stmt ¶40. Sprosty was included in the RIF and scheduled to be discharged on January 15, 2002, but he asked to stay on an additional two weeks to complete outstanding work. The request was granted, and Sprosty was discharged on January 31, 2002. *Id.* ¶41. Plaintiff, upon learning of the arrangement given to Sprosty, also requested and was granted permission to stay on until January 31, 2002. *Id.* ¶42; Francis Dep., Tr. 211:10-21. Other than Sprosty, plaintiff has not identified any other employee who was allowed to leave on a date beyond January 15, 2002. *See* Francis Dep., Tr. 213:21-25. Defendants' treatment of plaintiff and Sprosty was not disparate; to the contrary, it was identical. Both employees requested additional time to complete work and

both requests were granted. Accordingly, plaintiff has failed to raise any inference of discrimination regarding the negotiation of departures by RIF participants.

### c. Disparate Treatment in Offers of Other Employment within the Company

Plaintiff claims he was not give the same treatment as Caucasian employees with respect to comparable job offerings. Plaintiff states that the only position offered to him was a lower sales position that would require a move from New York to Dallas, Texas, as well as a 40% reduction in pay. Francis Aff., ¶21. Plaintiff claims he was not treated the same as other Caucasian employees and cites a letter dated January 25, 2002 that he received from Pactiv, apparently in response to his request for information about other employees affected by the RIF who were offered other positions. Brewington Aff., Letter, Ex. O. The text of the letter indicates that seventeen employees selected for the RIF were offered "the option of taking a demotion into an open, lower-paying position," nine of those took the demotion, seven declined and were terminated, and, at that time, one had yet to decide. *Id.* 1. Plaintiff notes that the letter did not indicate how much lower these salaries were, and concludes that "[t]o my knowledge, the Caucasian employees who were offered comparable positions during the January, 2002 RIF were not asked to take a 40% salary reduction, combined with an across-the-country relocation, and a demotion in position." Francis Aff. ¶21 (emphasis in original). This bare assertion is insufficient by itself to prove that Caucasian employees were given better offers of jobs within Pactiv. Although Pactiv's letter does not state the salary reductions tied to the offers, plaintiff did not apparently seek discovery from defendants on this issue during the course of this litigation or did not provide such evidence to the court in opposition to this motion.

### d. Other Evidence of Disparate Treatment

Plaintiff claims that other actions give rise to an inference of discrimination. Specifically, he claims that he was not given the same treatment with respect to "payment of timely severance and bonuses, and options to negotiate an alternative grounds [sic] for leaving." Pl. Memo in Opp., 9. As to the latter, plaintiff has not pointed to any employee affected by the January 2002 that was offered the opportunity to negotiate "alternative grounds" for leaving the company.

There is a clear dispute regarding the circumstances surrounding the payment of plaintiff's 2001 bonus. Defendants claim that the delay was an "administrative oversight," while plaintiff claims it was purposefully withheld after he complained of discrimination. Plaintiff made such complaints as early as February 5, 2002 in a letter from his attorneys. Pl.'s Stmt ¶58. Plaintiff further disputes Vinopal's statement that defendants "only learned" of the oversight after receiving a notification from the New York State Division of Human Rights despite letters from plaintiff's counsel written prior to that notification. Francis Aff. ¶46.

Similarly, there is a dispute regarding the failure of defendants to complete an annual performance appraisal for plaintiff for the calendar year 2001. Defendants claim that pursuant to company procedures, performance appraisals for calendar year 2001 would be conducted by February 8, 2002, and thus plaintiff did not receive one since he was discharged on January 31, 2002. Defts' Stmt ¶¶53-54. Plaintiff argues that in his experience, such appraisals had to be completed by year end, or December 31, 2001. Pl.'s Stmt ¶53. Plaintiff further claims that to his knowledge, "Caucasian and younger employees were not subjected to such withholding of their appraisals – including those who were included in the January, 2002 RIF." Francis Aff. ¶42. He does not, however, identify a single employee who did receive an appraisal despite being

discharged as part of the RIF.

The issues regarding the late payment of plaintiff's 2001 bonus and failure to conduct a performance appraisal are the only arguably relevant disputed facts identified by plaintiff. While the court entertains doubts that these facts are ultimately material to plaintiff's discrimination claims, it will, for purposes of this analysis, and drawing all inferences in favor of plaintiff, conclude that they are material to plaintiff's claims. Taking the issue of the late bonus payment and failure to conduct a performance appraisal together with plaintiff's assertions regarding the lack of African-American employees at Pactiv, the court will assume, for the sake of argument, that a minimal *prima facie* case has been established and proceed to the question of whether defendants can put forth a nondiscriminatory reason for their actions.

**2.\_\_\_\_\_Defendants' Nondiscriminatory Reasons**

Defendants' burden of providing a legitimate, nondiscriminatory reason for its action is satisfied if that reason "'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Schnabel v. Abramson,* 232 F.3d 83, 88 (2d Cir. 2000) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993)). A reduction in force may be such a neutral reason. *See, e.g., Alexander v. Computer Sciences Corp.,* 392 F. Supp. 2d 229, 233 (D. Conn. 2005). Pactiv presented evidence from its various officers regarding the legitimate business reasons behind the RIF. *See, e.g.*, Brewer Aff. ¶¶4-5. This evidence alone is enough to rebut the presumption of discrimination established in plaintiff's prima facie case. *See Gallo v. Prudential Residential Serv.,* 22 F.3d 1219, 1226 (2d Cir. 1994). The fact that defendants did not replace Francis after his termination but rather eliminated his position entirely further supports defendants' contention that it sought to decrease the layers of

21

management for business reasons.  *See, e.g., Scelza,* 33 F. Supp. 2d. at 199.

Defendants have provided ample evidence which, taken as true, permit the conclusion that the company conducted the RIF for business reasons; indeed plaintiff does not appear to dispute that defendants have offered evidence of a legitimate, nondiscriminatory reason for his discharge.  Thus the burden shifts back to plaintiff to show that the reason presented was not the true reason for plaintiff's discharge, but was rather a pretext for discriminatory actions.

**3.      Evidence that Defendants' Reasons were a Pretext**

While Pactiv "is certainly entitled to reduce its force and structurally reorganize its operations to maximize efficiencies, it may not discharge an employee" for a discriminatory reason.  *Gallo,* 22 F.3d 2d. at 1226 (may not discharge employee because of her age).  Francis must demonstrate that the RIF was a pretext for intentional race and/or age discrimination.  *See id.*  "Although courts must be careful not to second-guess an employer's business judgment that it makes in good faith, plaintiff must be allowed to show that [his] employer's asserted reasons for discharging [him] were a pretext" for intentional discrimination.  *Id.* (citing *Hicks,* 509 U.S. at 515).  The court may "look behind the employer's claim that it merely exercised a business decision in good faith."  *Montana,* 869 F.2d at 106.

Plaintiff Francis "must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging him is false and as to whether it is more likely that a discriminatory reason motivated the employers to make the employment decision."  *Scelza,* 33 F. Supp. 2d at 198 (E.D.N.Y. 1999).  Plaintiff need not show that the proffered reason was false, only that it wasn't the only reason and that age and/or race made a difference.  *See Montana*, 869 F.2d at 105.  In making this determination, the

court may examine factors such as the "strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 149 (2000).

As discussed above, plaintiff's *prima facie* case is weak, consisting only of disputed issues regarding events that happened after his termination, namely the company's failure to conduct his performance appraisal and the delay in paying his previous year's bonus. The court now turns to an examination of additional evidence presented by the parties.

Plaintiff has provided no statistical evidence to support his allegations of discrimination. He provides a document entitled "2002 RIF Term Worksheet" that indicates the age and race of employees affected by the RIF, *see* Brewington Decl., Ex. U, but he does not put that data into any context or evaluate the numbers by comparing them to the overall number of employees in Pactiv's work force. In addition to his undisputed assertion that he was the lone African-American National Account Manager, he claims that throughout his employment with the company, "Pactiv had an extremely low percentage of African-American employees in managerial, vice president or upper management positions." Francis Aff. ¶57. He does not, however, present any evidence to support this statement let alone support the assertion that his race was a factor in Pactiv's decision to eliminate his position. *See Montana,* 869 F.2d at 107 (no inference that gender was a factor in termination where plaintiff presented no evidence of total numbers of males and females in the company or percentages of each discharged or offered other positions). Plaintiff has not given any evidence beyond his personal observation.

Absent statistical evidence, plaintiff may use circumstantial evidence to establish that

23

defendants had a discriminatory intent when they discharged him. Plaintiff points to his positive work history and success, which is not disputed by defendants, as proof that there must have been some discriminatory intent behind the elimination of his position. Defendants have not challenged plaintiff's job performance in any way and have not suggested that there were reasons for his discharge beyond the business decision to eliminate his position. Plaintiff claims that Brewer "did not know anything about my sales productivity and revenue generating achievements, as a National Accounts Manager within PPNA," Francis Aff. ¶28, a claim that Brewer has confirmed *See* Hrg Tr. 44:19-45:9. Despite the undisputed fact that plaintiff's job performance was positive, "in the context of a necessary reduction-in-force, an employee's work history is not relevant." *O'Sullivan v. New York Times,* 37 F. Supp. 2d 307, 318 (S.D.N.Y. 1999) (citing *Wado v. Xerox Corp.,* 991 F. Supp. 174, 214 (W.D.N.Y. 1998) (even long-standing, capable employees may be terminated when a company downsizes)).

Plaintiff further suggests that the defendants' stated reasons were pretextual since he was a superior employee and that the discharge of someone with his experience would be a bad business decision. The court cannot "merely substitute its judgment for that of a business judgment, nor could it determine that [the employer] should more properly have released another instead of [plaintiff]." *Montana,* 869 F.2d at 106 (citations omitted). Whether Pactiv was wrong or unduly harsh to discharge Francis does not create liability under discrimination statutes. For example, the ADEA "does not make employers liable for doing stupid or even wicked things; it makes them liable for *discriminating,* for firing people on account of their age. The record in the instant case is devoid of evidence, direct or circumstantial, sufficient to support a finding" that plaintiff was fired because of his age. *Norton v. Sam's Club,* 145 F.3d 114,119-20 (2d Cir. 1998)

(emphasis in original); *see also Lizardo,* 270 F.3d at 104 (in race-based discrimination case, bare evidence of "mistreatment" is insufficient). Absent evidence that there was a discriminatory purpose in addition to the business purpose, the court cannot substitute its judgment for that of a business judgment.

The National Account Manager position in the PPNA business unit was eliminated as part of the RIF, and has not been re-instituted. Defts' Stmt ¶68. Condon, the Vice President of Sales, assumed plaintiff's duties servicing the national accounts, thus accomplishing Brewer's stated business purpose. Plaintiff's other responsibilities were split among other employees including Dan Brosseau (Caucasian, age approximately 38), Michael McKeel (Caucasian, age approximately 63), and Lisa O'Donnell (Caucasian, age approximaely 37). *Id.* ¶¶65-67. There is no suggestion that he was directly replaced or that someone younger or of a different race was hired shortly after to take his job. *Cf. Carlton v. Mystic Transp., Inc.,* 202 F.3d 129 (2d Cir. 2000) (fact that younger employee was hired three months after plaintiff's discharge supported inference of age discrimination); *Alexander v. Computer Sciences Corp.,* 392 F. Supp. 2d 229 (D. Conn. 2005) (after plaintiff's termination, employer continued to advertise his position within one month of layoff). The fact that other employees have assumed his work does not mean plaintiff was replaced but "merely demonstrates that, as in most 'reduction-in-force' cases, [the employer] has been successful in reducing the number of employees required to perform certain work." *Suttell v. Manufacturers Hanover Trust Co.,* 793 F. Supp. 70, 73 (S.D.N.Y. 1992).

Plaintiff has testified that he is not aware of any comments concerning either his race or his age made by anyone at Pactiv. Francis Dep., Tr. 229:5-230:9. While evidence of direct discriminatory comments are not necessary to sustain case alleging discrimination, the absence of

such comments may be considered by the court. *See McLean-Nur v. City of New York,* 2000 WL 297176, at *6 (S.D.N.Y. March 21, 2000) (lack of derogatory comments about race or age a factor in finding of no discriminatory intent); *Scelza,* 33 F. Supp 2d at 202-03 (citing *Pearlstein v. Staten Island Univ. Hosp.,* 886 F. Supp. 260 (E.D.N.Y. 1995)).

The facts that plaintiff is African-American and that he was 60 years old at the time of his discharge cannot alone make out a case of discrimination. Plaintiff has "done little more than cite to [his] mistreatment and ask the court to conclude that it must have been related to [his] race. This is not sufficient." *Lizardo,* 270 F.3d at 104 (citation omitted). Plaintiff seems to argue that only discriminatory intent could explain his discharge, but has not provided any evidence, direct or circumstantial, to support his conclusion. Plaintiff has not established that he was replaced, or that he was subjected to derogatory comments or treatment regarding his race or age, or that defendants have given inconsistent reasons for his discharge, or that he was treated differently from similarly situated employees. While the lack of evidence in any one of these areas may not dictate a finding in defendants' favor, the lack of evidence in all of them does support such a finding.

Defendants, however, have presented evidence that no discriminatory intent was present. Plaintiff has offered no evidence to rebut Brewer's statement that he was unaware of plaintiff's race or age when he made the decision to eliminate the National Account Manager position within the PPNA business unit. Brewer Aff. ¶5. Defendants' testimony has been consistent on the business purpose behind the elimination of Francis's position, that is, Brewer's desire to have the Vice President of Sales position service the national accounts to put PPNA in line with its competitors. Other actions of defendants show that Francis received treatment that may have

actually been better than that given to others. For example, plaintiff was allowed to use his company car beyond his departure date. *See* Francis Dep. 211:22-213:5; Vinopal Aff. ¶13.

An employer is entitled to judgment as a matter of law "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves,* 530 U.S. at 148 (citations omitted). In this case, "none of [plaintiff's] evidence has probative value, and the evidence does not gain in inferential power by being lumped together. [Plaintiff] has failed to meet his burden of producing evidence which supports a finding that age [or race] played a motivating part in his discharge." *Scelza*, 33 F. Supp 2d 202 (citing *Lanahan v. Mutual Life Ins. Co.,* 15 F. Supp 2d 381 (S.D.N.Y. 1998), *aff'd* 181 F.3d 83 (2d Cir. 1999)). As other courts have noted, "a jury cannot infer discrimination from thin air. And thin air is all the plaintiff has produced in the case before us." *Norton,* 145 F.3d at 119; *see also Lizardo,* 270 F.3d at 104. Viewing all the evidence in the light most favorable to plaintiff, the court concludes that no rational jury could find that Pactiv's decision to terminate plaintiff was motivated by either race or age related bias. *See Norton,* 145 F.3d at 119 (plaintiff's "very weak prima facie case, combined with an at best highly dubious showing of pretext, that in itself does not implicate discrimination, is simply not enough to support the jury's conclusion that he was fired because of his age"). Accordingly, the ADEA, Title VII, and New York Human Rights claims must be dismissed.

## C.     Section 1981 Claim

Plaintiff also claims to have been discriminated against by reason of his race in violation

of 42 U.S.C. §1981.[5]   To support a claim pursuant to §1981, a plaintiff must allege: (1) membership in a protected class; (2) an intent to discriminate against plaintiff on the basis of race and, (3) that the discrimination is aimed at an activity covered by §1981.  *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir. 1993); *Farrell v. Child Welfare Admin.*, 77 F. Supp. 2d 329, 332 (E.D.N.Y. 1999), *aff'd* 2001 WL 1486533 (2d Cir. 2001).  To state a claim pursuant to §1981, plaintiff must allege facts "sufficient to show a plausible inference that the defendant purposefully and intentionally discriminated against him because of his race." *Chadha v. Connecticut Med. Exam'g Bd.,* 1999 WL 1067805, at *3 (D. Conn. Oct. 29, 1999).

For all the reasons stated *supra,* plaintiff has failed to establish an inference that he was discharged because of his race.  Accordingly, his section 1981 claim must also be dismissed.

## C.      Breach of Contract Claim

Finally, plaintiff alleges a cause of action for breach of contract.  Under New York law, "[a]bsent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party."  *DePetris v. Union Settlement Ass'n,* 86 N.Y.2d 406, 410 (1995).  The presumption of an at will relationship may be rebutted "by establishing an 'express limitation in the individual contract of employment' curtailing an employer's right to terminate at will."  *Baron v. Port Auth. of New York and New Jersey,* 271 F.3d 81, 85 (2d Cir. 2001) (quoting *Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847, 851 (2d Cir. 1985)).  "Policies in a personnel manual specifying the employer's practices with respect to the

---

[5]Section1981 provides that "[a]ll persons. . . shall have the same right. . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . ." 42 U.S.C. §1981.

employment relationship, including the procedures or grounds for termination, may become a part of the employment contract." *Baron,* 271 F.3d at 85. An employee alleging breach of an implied contract created through such policies must prove that "(1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatitves) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment." *Id.* (citing *Lobosco v. New York Telephone Co.,* 96 N.Y.2d 312, 316 (2001)). Courts have cautioned, however, that "[r]outinely issued employee manuals should not lightly be converted into binding employment agreements." *Lobosco,* 96 N.Y.2d at 317.

Defendants argue that plaintiff was an at will employee and that there was no express agreement limiting Pactiv's right to discharge plaintiff. Defts' Memo 24-25. Thus plaintiff must rebut the presumption that he was an at will employee. Plaintiff simply cites his Complaint which states that the "terms and statements contained in Defendants' Employee Handbook created an implied contract with the plaintiff, that defendants would not unlawfully discriminate against the plaintiff during the employment relationship with respect to its personnel decisions." Compl. ¶78. He has failed, however, to support this allegation with any evidence, including the handbook.[6] Plaintiff does not even provide language purportedly quoted from the pertinent parts of the handbook. Thus, plaintiff has not established that an express written policy limiting the

---

[6]Defendants have provided a letter to Pactiv employees dated May 8, 2000 which purports to "reaffirm and restate the Company's policy and commitment to the principles of equal employment opportunity." Vinopal Aff., Ex A. To the extent this document contains the "handbook" language referred to by plaintiff in his complaint, it does not constitute an express policy limiting Pactiv's right of discharge, but rather is a general statement of anti-discriminatory intent. *See Fitzgerald v. Martin-Marietta,* 256 A.D.2d 959, 960 (3d Dep't 1998) (promises of fair and equal treatment do not give rise to an implied employment contract).

employer's right of discharge exists.

Even assuming the missing handbook included language that might be construed as limiting Pactiv's right to discharge plaintiff, he has not provided evidence to establish that he either knew of the policy or that he relied upon it to his detriment.  Plaintiff relies on his evidence of discrimination to support a claim that defendants' breached their promise of non-discriminatory treatment.  He does not provide any evidence that he explicitly knew of any policy contained in the handbook–indeed his deposition testimony suggests the opposite since he testified that he never read Pactiv's anti-discrimination policies.  Francis Dep. 180:6-9. Moreover, he does not provide any evidence of his detrimental reliance upon the policy beyond the bare assertion, without citation to evidence, that he "was induced into an employment relationship through attractive salary and benefits."  Pl.'s Memo in Opp 24.   Plaintiff has failed to present any credible evidence of detrimental reliance.  *See, e.g., Abdullah v. Skandinaviska Enskilda Banken Corp.,* 1999 WL 945238, at *9 (S.D.N.Y. Oct. 19, 1999)(detrimental reliance not established where sole theory was that if plaintiff had received a competing offer, he would have refused it).  Accordingly, his breach of implied contract claim must also be dismissed.

## CONCLUSION

In sum, there is no evidence in the record upon which a jury could reasonably conclude that the defendants discriminated against plaintiff on the basis of his race or age, or that an implied contract was breached.  Thus, the defendants' motion for summary judgment is granted, and the Clerk of the Court is directed to close the case.

Dated:  Central Islip, New York
      March 21, 2007

**SO ORDERED:**

 /s/William D. Wall
WILLIAM D. WALL
United States Magistrate Judge